**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA,

v.

JESSE ALLEN BURNEY,                                    Criminal No. ELH-15-0305

*Defendant*.

**MEMORANDUM OPINION**

Defendant Jesse Allen Burney was sentenced on October 14, 2016, to a term of 252 months (21 years) of incarceration for armed bank robbery, in violation of 18 U.S.C. § 2113.  ECF 62. Burney, while self-represented, filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  ECF 70.  He asks for a "reduction in term of imprisonment," due to the "incapacitation of the defendant's parent when the defendant would be the only available care giver for the parent."  *Id.* at 1.[1]

In particular, defendant asserts that his mother, who is now almost 71 years of age, *id.*, is "currently living in a dilapidated house, both mentally and physically disabled and her conditions are growing worse with time."  *Id.* at 7.  Further, he maintains that his two sisters are also physically and mentally disabled and thus is unable to care for his mother.  *Id.* at 6, 7.  Burney also asserts: "Me, my mother's only son, who suffers from no physical or mental ailments, strong as an ox at the age of 43 am in prison sitting helpless while my mother suffers daily."  *Id.* at 7.

---

[1] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

1

The Court subsequently appointed counsel to represent Burney, pursuant to the Criminal Justice Act. ECF 72. On November 11, 2025, Burney's counsel filed a supplemental memorandum, with exhibits, in support of Burney's motion. ECF 81 (sealed version); ECF 84 (redacted, public version). Counsel asserts that defendant's "family situation, when combined with the other Section 3553(a) sentencing factors, clearly warrant relief." ECF 81 at 8. In particular, he "requests an order reducing [defendant's] sentence to time served or, in the alternative, add some or all of the unserved portion of his original sentence to his term of supervised release so that it can be served on home confinement." *Id.* at 9.

I shall refer to defendant's *pro se* motion (ECF 70) and the supplemental memorandum (ECF 81, ECF 84) collectively as the "Motion." For privacy reasons, I shall refer to defendant's mother by her initials, K.B. Similarly, I shall refer to defendant's sisters by their initials, R.H. and S.B.

The Motion is supported by several exhibits. They include the denial by the Bureau of Prisons ("BOP") of Burney's request for compassionate release (ECF 81-1); the medical records of defendant's mother (ECF 81-2); a letter to the Court from R.H. (ECF 81-3); the medical records of R.H. (ECF 81-4); a letter to the Court from S.B. (ECF 81-5); and the medical records of S.B. (ECF 81-6).

The government opposes the Motion. ECF 85 (the "Opposition"). The Opposition is supported by three exhibits. They include the transcript from defendant's sentencing hearing before this Court on October 14, 2016 (ECF 85-1); the public information inmate data from the BOP (ECF 85-2); and defendant's inmate disciplinary data. ECF 85-3. Defendant did not reply. *See* Docket.

Burney, who was born in June 1982, is now almost 44 years of age. He is currently incarcerated at Petersburg Medium FCI. *See Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 12690-067) (last accessed May 19, 2026). Defendant has a projected release date of November 3, 2033. *See id.*

No hearing is necessary to resolve the Motion. Local Rule 105.6. For the reasons that follow, I shall deny the Motion, without prejudice.

## I. Background

Burney was indicted on May 28, 2015, for the robbery of a bank in Maryland on April 27, 2015. ECF 1. He was charged with Armed Bank Robbery, in violation of 18 U.S.C. §§ 2113(a), (d), and (f) (Count One); Forced Accompaniment, in violation of 18 U.S.C. § 2113(e); Use and Carry of a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c) (Count Three); and Felon in Possession of a Firearm, under 18 U.S.C. § 922(g)(1) (Count Four). ECF 1; *see* ECF 81 at 1. A Superseding Indictment was filed on March 3, 2016. ECF 33. It omitted the Forced Accompaniment charge. *See id.*

Pursuant to a Plea Agreement (ECF 43), tendered under Fed. R. Crim. P. 11(c)(1)(C), Burney entered a plea of guilty on July 1, 2016, to Count One, charging Armed Bank Robbery. ECF 42. In the Plea Agreement, the parties disagreed about whether defendant qualified as a Career Offender. ECF 43, ¶¶ 6(e), (g). Nevertheless, the parties agreed to recommend a sentence of 252 months of imprisonment (21 years) as the appropriate disposition of the case. *Id.* ¶¶ 9, 10.

The Plea Agreement contains a Statement of Facts, to which Burney stipulated. *See* ECF 43 at 9, 10. The agreed facts are as follows.

On the morning of April 27, 2015, at approximately 10:35 a.m., Burney entered the PNC Bank in Whiteford, Maryland (the "Bank"). ECF 43 at 9. He was wearing a motorcycle helmet

with the reflective visor down, a tactical vest, a grey sweatshirt, gloves, and a black backpack. *Id.* The backpack contained an AK-47 with a sock over the barrel, which was visible through the top of the backpack. *Id.*

Upon entering the Bank, Burney withdrew a taser from his pocket and pointed it at the tellers, declaring "this is a robbery." *Id.* Burney demanded $100,000 from the tellers and instructed them to put the cash into a black trash bag. *Id.* Burney then shouted, "If you don't open the safe in 15 seconds, I will start shooting!" *Id.* The tellers complied with Burney's demands and gave him money from the Bank's vault. *Id.* Burney put the trash bag, which was filled with $97,237.00 in U.S. currency, into his backpack. *Id.* As he was leaving, Burney told the Bank's employees: "If I see any police, I'm going to come back and shoot you." *Id.*

Burney fled the scene on a dirt bike and drove to a black Kia SUV that he had previously parked several miles away from the Bank. *Id.* He hid the bike under a tarp and drove away in the SUV. *Id.*

The money from the Bank contained a GPS device through which law enforcement officers were able to track Burney. *Id.* As law enforcement officers tracked him, Burney drove the SUV into a farm field in Lower Chanceford Township, Pennsylvania. *Id.* He then exited the SUV, which still had the key in the ignition, and hid from the police in the nearby woods. *Id.*

A Pennsylvania State Trooper found Burney hiding in the woods. *Id.* Burney had on the black backpack, which contained a loaded AK-47 magazine. *Id.* at 9, 10. Near Burney, investigators located the black trash bag, which contained the money that Burney stole from the Bank and the GPS tracking device. *Id.* at 10. A K-9 search team located the AK-47 thirty yards from where Burney was apprehended by the Pennsylvania State Trooper. *Id.* The AK-47, which was fully operable, had a loaded 30-round magazine attached and a round in the chamber. *Id.*

Burney was taken into custody and waived his *Miranda* rights. *Id.*; *see Miranda v. Arizona*, 384 U.S. 436 (1966). He admitted, in a recorded statement, that he carried out the robbery of the Bank and had a gun with him at the time. *Id.*

During questioning, Burney also informed investigators that he owed $100,000.00 in restitution with regard to a federal conviction for a prior bank robbery. *Id.* at 6. Burney served approximately 10 years in prison for the prior offense. *Id.*

After the guilty plea proceedings, the U.S. Probation Office prepared a Presentence Report ("PSR"). It is docketed at ECF 46. But, based on rulings by the Court at sentencing, it was subsequently amended. *See* ECF 61.

The PSR reflects that defendant had several prior adult convictions. Notably, in 2005, at the age of 22, Burney pled guilty in the U.S. District Court for the Middle District of Pennsylvania to the offenses of conspiracy to commit bank robbery and possession of a firearm in furtherance of crimes of violence. ECF 61, ¶ 51. In particular, Burney committed nine bank robberies between December 17, 2001, and December 18, 2003. *Id.* For most of those bank robberies, defendant did not act alone; he was joined by Shawn Powell. *Id.* And, the pair usually stole cars before robbing the banks. *Id.* Further, during a proffer interview with investigators, "Burney admitted to committing three additional bank robberies on his own." *Id.* In that case, on April 26, 2005, defendant was sentenced to 144 months of imprisonment and five years of supervised release. *Id.* He was released from prison on May 30, 2014. *Id.* Of import, defendant was on supervised release from that case when he committed the underlying offense. *Id.*; *see also* ECF 43 at 10.

Burney's prior criminal convictions yielded a subtotal criminal history score of nine points. ECF 61, ¶ 52. Two points were added because, at the time the instant offense was committed, Burney was on supervised release with respect to the prior bank robbery. *Id.* ¶ 53. Thus, as

calculated by the PSR, Burney had a total criminal history score of eleven points. *Id.* ¶ 54. That would result in a criminal history category of V. *Id.* ¶ 54. However, if defendant were sentenced today, he would have only one status point. *See* U.S.S.G. § 4A1.1(e). But, even so, with ten criminal history points, defendant's criminal history category would remain a V.

In any event, the initial PSR (ECF 46) determined that Burney qualified as a Career Offender. *Id.* ¶ 55.[2] Therefore, five points were added to defendant's offense level of 29, *id.* ¶ 33, and his criminal history category was increased to VI. *Id.* ¶ 55. According to that PSR, after three deductions under U.S.S.G. § 3E1.1, defendant had a final offense level of 31. *Id.* ¶ 36. With an offense level of 31 and a criminal history category of VI, the initial PSR (ECF 46) indicated that the Guidelines for Count One called for a period of incarceration ranging between 188 and 235 months. *Id.* at 20.

On August 31, 2016, the Court ordered the government to supplement its sentencing memorandum (ECF 50) to address Burney's status as a Career Offender. ECF 53. Also on August 31, 2016, the government filed a letter with the Court, stating: "In light of the Defendant's desire to proceed to sentencing as quickly as possible, the Government withdraws its contention that Mr. Burney qualifies as a Career Offender.[]" ECF 52. However, in a letter dated September 12, 2016, the government reversed course, renewing its claim that Burney qualified as a Career Offender. ECF 56. The defense responded. ECF 58. In any event, and as noted, in the Plea Agreement (ECF 43) the parties agreed to a total sentence of 252 months of imprisonment, regardless of defendant's Career Offender status. *Id.* ¶¶ 9, 10.

---

[2] Presumably, this determination was based on the felony drug offense in ECF 46, ¶ 45, as well as the conviction for conspiracy to commit armed bank robbery. *Id.* ¶ 51.

Sentencing was held on October 14, 2016.  ECF 60.  The government argued, erroneously, that the defendant's prior conviction for conspiracy to commit armed bank robbery constituted a crime of violence.  *See* ECF 85-1 at 11-36.  After a lengthy exchange with counsel, I concluded that defendant did not qualify as a Career Offender.  *Id.* at 47.  Therefore, defendant had a final offense level of 26 (ECF 61, ¶ 36), and a criminal history category of V.  *Id.* ¶ 54.  On this basis, defendant's Guidelines called for a sentence ranging from 110 to 137 months of imprisonment.

During sentencing, the Court grappled with why defendant's proposed sentence in the Plea Agreement was far greater than the range under the Guidelines.  ECF 85-1 at 54-55.  The government said, in part, *id.* at 56-57:

> Mr. Burney gets the substantial benefit of a bargain here.  The benefit of the bargain . . . is, were the Government to proceed to trial, he would not only have a 25-year mandatory minimum for the § 924(c); he would . . . have a 10-year mandatory minimum exposure for the forced accompaniment.  That means, at the trial, if convicted, Mr. Burney would face . . . a mandatory minimum sentence of 35 years.

The government added, *id.* at 57:  "Mr. Burney is getting a substantial benefit . . . 21 years is a lot less than 35 years."

Defense counsel acknowledged that the defendant's exposure to the 35-year mandatory minimum "drove the bargain . . . ."  *Id.* at 61.  The defense added:  "We think this is an appropriate outcome . . .  [W]e're here to urge the Court to accept [the Plea Agreement]."  *Id.*

I said, in part, *id.* at 57-58:

> It seems to me, when I evaluate a (c) plea, I am being asked to determine whether it's appropriate, reasonable, sufficient, but not greater than necessary.  And, in order to make that analysis in a case like this where, on the face of it, the recommended sentence under the terms of the (c) plea is way above the guidelines, I need to know something about the why.

*       *       *

I have to look at everything. I have to look at: Is this in the interest of the Government? It spares the Government a trial. It spares the victims having to come to court. The Government had a very big stick it was wielding, et cetera. And then I have to look at the considerations as far as the Defendant is concerned, and those do take into account the reality of how he was charged and what the Government is dropping.

I think that I'm allowed to consider that.

Further, the Court said, *id.* at 74:

My understanding is that the strength of the Government's evidence is overwhelming and that, instead of helping, I would actually be harming [the defendant if I reject the C plea]. The Defendant would face a conviction on a second § 924(c). Assuming that there is no challenge to the first § 924(c), even if there is, he would have a § 924(c) conviction, and, most likely, it would be a second § 924(c). His exposure is so great that I have now understood why the Defense says it asks the Court to go along with this sentence. And it is why I am willing to go along with the (c) plea in this case.

The Court continued, *id.* at 74–75:

The Government gave up the right to pursue a far more serious charge with a far greater sentence hanging over this defendant's head if the case went to trial and he were convicted. And the Defendant, as I understand it through counsel, has agreed to the (c) plea rather than run the risk of being convicted of that far more serious charge, the second § 924(c), with a potential of a minimum mandatory 35-year sentence and a potential up to life, and that the bargain, as it was, which I'm not a part of but I've been asked to bless, if you will, by going along with the (c) plea, is what it is.

In accordance with the terms of the Plea Agreement, the Court imposed the agreed upon term of 252 months of imprisonment, with credit dating from April 27, 2015. ECF 62 (Judgment). It is followed by five years of supervised release. *Id.*

The government explains in its Opposition that, given the charges lodged against Burney, he "faced a potential mandatory minimum sentence of 35 years—10 years as to Count One and 25 years as to Count Two." ECF 85 at 2. With respect to Count Two, 18 U.S.C. § 924(c)(1)(C) provides:

In the case of a violation of this subsection that occurs after a prior conviction under this subsection has become final, the person shall—

(i) be sentenced to a term of imprisonment of not less than 25 years; and
(ii) if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.

As discussed, in 2005 Burney pled guilty to Possession of a Firearm in Furtherance of Crimes of Violence, under 18 U.S.C. § 924(c). And, 18 U.S.C. § 924(c)(1)(C) requires a mandatory minimum term of 25 years when, as here, the defendant has previously been convicted under § 924(c).

As of October 15, 2025, Burney's disciplinary records at the BOP reflect thirteen incidents, resulting in fifteen sanctions. ECF 85-3. Burney has incurred sanctions, *inter alia*, for assaulting without serious injury, possessing a dangerous weapon, refusing a physical test/examination, fighting with another person, refusing to obey an order, and being in an unauthorized area. *Id.* However, BOP disciplinary records indicate that Burney has not received a sanction since December 11, 2022. *Id.* at 2.

Burney is currently serving at Petersburg Medium FCI. *See Bureau of Prisons Inmate Locator,* https://www.bop.gov/inmateloc/ (search by BOP Register Number 12690-067) (last accessed May 19, 2026). As noted, he has a projected release date of November 3, 2033. *Id.* Burney has currently served about 132 months of his 252-month sentence, or roughly 52%.

Additional facts are included, *infra.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Davis,* __ F.4th __, 2026 WL 1291531, at *3 (4th Cir. May 12, 2026); *United States v. Smith*, 2026 WL 509318, at *1 (4th Cir. Feb. 24, 2026) (per curiam);

*United States v. Moody*, 115 F.4th 304, 310 (4th Cir. 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  It is commonly termed the "'compassionate release exception.'" *Moody*, 115 F.4th at 310; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (per curiam) (unreported) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release. . . ."). Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court, in its discretion, to reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction,"; "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"; and the court has considered the factors under 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A); *see also Fernandez v. United States,* 608 U.S. __, 2026 WL 1485476, at *7 (May 28, 2026); *United States v. Washington*, 161 F.4th 816, 818 (4th Cir. 2025); *United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025); *Hargrove*, 30 F.4th at 194.

10

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion made by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see, e.g., Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP). However, the safety valve of § 3582 languished, because the BOP rarely filed such a motion on an inmate's behalf. As a result, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In 2018, with the passage of the First Step Act, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582. *Malone*, 57 F.4th at 173. In particular, the FSA authorizes a court to grant compassionate release "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A) (emphasis added); *see also Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). In other words, a federal inmate is now able to file a motion for compassionate release directly with the court, as long as the inmate first exhausts administrative

remedies. *McCoy*, 981 F.3d at 275–76. If a defendant has already exhausted administrative remedies upon filing a first motion for compassionate release, the defendant does not need to meet the bar for exhaustion a second time, should the defendant seek to renew the motion. *United States v. King*, 2025 WL 1692747, at *1 (4th Cir. June 17, 2025) (unreported).

In *Fernandez*, 2026 WL 1485476, at *7, the Supreme Court underscored that "Congress made compassionate release available only when 'extraordinary and compelling reasons' justify it." And, said the Court, "This is a demanding standard." *Id.* It reasoned, *id.*: "While Congress has not defined the 'extraordinary and compelling reasons' that may warrant a reduced sentence, these criteria are not empty vessels. 'Extraordinary' means 'most unusual,' 'far from common,' and 'having little or no precedent.' 'Compelling' means 'tending to convince or convert by or as if by forcefulness of evidence.'" (citations omitted).

Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.[3]

The first step consists of two parts. The court "must determine: (1) whether extraordinary and compelling reasons warrant. . .a [sentence] reduction; and (2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Malone*, 57 F.4th at 173; *see United States of America, v. Alvis Damon Williams,* 2026 WL 752605, at *1 (4th Cir. Mar. 17, 2026) (per curiam)*; United States v. Boyd*, 2026 WL 595579, at *1 (4th Cir. Mar. 3, 2026) (per

---

[3] The Fourth Circuit has said that there are two criteria, and that the first criterion consists of two steps. *See, e.g.*, *Davis*, 2026 WL 1291531, at *3; *Malone*, 57 F.4th at 173. But, in *Crawley*, 140 F.4th at 169, the Fourth Circuit stated that there are three criteria. Whether the criteria are counted as two or three, the substance is the same.

curiam); *Smith,* 2026 WL 509318, at *1; *United States v. Johnson,* 2026 WL 237729, at *1 (4th Cir. Jan. 29, 2026) (per curiam); *United States v. Pope,* 2026 WL 207491, at *1 (4th Cir. Jan. 27, 2026) (per curiam); *see Moody,* 115 F.4th at 310; *Davis,* 99 F.4th at 653; *Bond,* 56 F.4th at 383; *Bethea,* 54 F.4th at 831; *United States v. Kibble,* 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied,* 142 S. Ct. 383 (2021).  The court's analysis of these two parts goes hand in hand. *United States v. Burleigh,* 145 F.4th 541, 547 (4th Cir. 2025).  If that first step is met, the court then proceeds to the second step.

Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea,* 54 F.4th at 831; *see Williams,* 2026 WL 752605, at *1; *Moody,* 115 F.4th at 310; *Malone,* 57 F.4th at 174; *Hargrove,* 30 F.4th at 194; *United States v. High,* 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis,* 99 F.4th 647; *Kibble,* 992 F.3d at 330.  "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman,* 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*); *see Malone,* 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins,* 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis,* 99 F.4th 647.  Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea,* 54 F.4th at 834; *see Smith,* 2026 WL 509318, at *2; *Washington,* 161

13

F.4th at 820; *United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023) (unreported); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

But, the Fourth Circuit has recognized that, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54. If there is no applicable policy statement relating to the defendant's compassionate release motion, the court has discretion to make its "own independent determination of what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)." *Burleigh*, 145 F.4th 541, 548 (cleaned up); *see also United States v. Johnson*, 143 F.4th 212, 215 (4th Cir. 2025) (explaining that, "[i]n the absence of an applicable policy statement, district courts" have the power to "consider *any* extraordinary and compelling reason for release") (cleaned up).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that Policy Statement did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 981 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2021) (emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 281, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the *McCoy* Court held: "When a defendant exercises his . . . right to move for compassionate release on his own behalf , . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *Id.* (citation omitted). As a result, district courts were

14

"empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

Effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)).  The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction").  As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions.  18 U.S.C. § 3582(c)(1)(A).  The court should apply the Policy Statement that is applicable "at the time the court renders its decision[,]" not at the time the motion is filed.  *Crawley*, 140 F.4th at 170.

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

(a) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

   (1) (A) extraordinary and compelling reasons warrant the reduction; or

   (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

   (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

15

(3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency. . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the fact that the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, § 1B1.13(b)(4)(A), (B); and for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a non-retroactive change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed. . . .", § 1B1.13(b)(6).

In deciding whether a defendant has met the ten-year requirement, district courts can only consider the time a defendant has served in prison and cannot adjust that amount with good-time credits. *Crawley*, 140 F.4th at 172–73. But, under § 1B1.13(b)(5), the district court may consider "any other circumstance or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." The capacious language in § 1B1.13(b)(5) underscores that the enumerated circumstances listed in the Policy Statement are not an "exhaustive list" of extraordinary or compelling reasons. *Johnson*, 143 F.4th at 216. For

example, in *Johnson*, the Court affirmed a district court's decision to reduce a defendant's sentence based on the disparity between the defendant's sentence and those of his co-conspirators. *Id.* at 215–16.  But, in *Fernandez*, 2026 WL 1485476, at *7, the Supreme Court made clear that "the supposed invalidity of a conviction is not among the 'extraordinary and compelling reasons' that justify compassionate release."

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW."  It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *Id.*; *see Davis*, 99 F.4th at 654.[4]

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant.  It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. That section provides that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G.

---

[4] In *Concepcion v. United States*, 597 U.S. 481 (2022), the Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500.  However, the Court acknowledged that "Congress or the Constitution [may] limit[ ] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence. . . ." *Id.* at 486.  "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495.

§ 1B1.13(d). "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." *Id.* And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant prisoner establishes extraordinary and compelling reasons for relief, a reduced sentence does not necessarily follow. The court must then consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon*, 560 U.S. at 826–27; *United States v. Washington* 161 F.4th 816, 821 (4th Cir. 2025); *Brown*, 78 F.4th at 128; *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in

exercising its discretion). Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).

Additionally, the court may consider the "'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Burleigh*, 145 F.4th 541, 548 (quoting 18 U.S.C. § 3553(a)(1), (3), (6)). The Fourth Circuit has observed that "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 F.3d at 500). And, district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at 656; *see Washington*, 2025 WL 3559989 at *3; *United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021). In weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said: "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis." But, "'the record as a whole'" must demonstrate that the judge considered the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

19

In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018). Moreover, the district court's "discretion is not boundless" and "in exceptional case[s]" the district court can abuse this discretion either by neglecting to "adequately explain how it weighed the § 3553(a) factors" or by "failing to recognize that the relevant § 3553(a) factors clearly favor release." *United States v. Smith*, 2025 WL 1864767, at *3, *4 (4th Cir. July 7, 2025) (unreported) (cleaned up) (finding that the district court abused its discretion by failing to acknowledge how the "multiplicity of factors combine to make the case for compassionate release").

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see Washington*, 161 F.4th at 821; *Malone*, 57 F.4th at 170; *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

In any event, as stated, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022

WL 2314300, at *1 (quoting *High*, 997 F.3d at 190). It is "not difficult" for a district court to satisfy this standard. *Burleigh*, 145 F.4th 541, 550. However, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant actually received and the sentence he would receive, if sentenced under current law. *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *see Moody*, 115 F.4th at 310 (recognizing that a defendant may not "challenge the validity of a sentence in a compassionate release" motion but explaining that a court may consider whether a defendant's sentence would be shorter "because of changes in law."). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . ." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th 647, is informative. The Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 654–55. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661. According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)).

The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change

in law so substantial." *Davis*, 99 F.4th at 661 (citing *Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)).  Nevertheless, in *Burleigh,* 145 F.4th at 550, 551, the Court recognized that, even if a defendant's sentence "would be shorter if issued today," this fact does not "increase the burden on district courts to explain their decision."

### III. Discussion

### A. Exhaustion

Burney asserts that he has exhausted his administrative remedies.  ECF 81 at 5.  But, he concedes that he filed the Motion with the Court and *then* exhausted his administrative remedies. *Id.*  In particular, Burney states that on July 9, 2025, he "filed an administrative request with the Bureau of Prisons for compassionate release."  *Id.* at 2.  Then, "[o]n July 31, 2025, the Bureau of Prisons denied his request."  *Id.*; *see* ECF 81-1.  As noted, Burney filed the Motion on June 17, 2025.  *See* ECF 70.

Burney maintains that "now that he has satisfied that requirement, if the Government elects to invoke the exhaustion requirement, the Court should not dismiss and require him to refile."  ECF 81-1 at 5.  Therefore, Burney contends: "The Court should find that Mr. Burney has complied with the statutory requirement, or in the alternative, exercise its discretion to waive it."  *Id.*

The government, for its part, expressly "waives any argument that the Defendant's motion should be denied for failing to meet the exhaustion requirement."  ECF 85 at 6 n.4.  Although the government suggests that Burney "has likely not technically met the exhaustion requirement under the statute," because he submitted his BOP request after filing his motion, it acknowledges that the "likely outcome would be dismissal without prejudice," after which Burney could simply refile. *Id.*

22

The government's waiver resolves the issue.  The Supreme Court has determined that a plaintiff's failure to exhaust administrative remedies does not divest the court of jurisdiction.  *See Fort Bend County v. Davis*, 587 U.S. 541, 549 (2019).  Rather, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'"  *Id.* (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005)); *see Davis*, 99 F.4th at 653 n.2 ("In *United States v. Muhammad*, we held that § 3582(c)(1)(A)'s exhaustion requirement is a 'non-jurisdictional claim-processing rule' that can be waived or forfeited if not timely raised. 16 F.4th 126, 130 (4th Cir. 2021).").

Because the government has affirmatively waived any exhaustion defense, the Court need not decide whether Burney's post-filing administrative request satisfies § 3582(c)(1)(A). Accordingly, I turn to whether Burney has met his burden of showing that there are extraordinary and compelling reasons to warrant a reduction in his sentence.

### B. Family Circumstances

Burney contends that his family circumstances, namely the incapacitation of his mother, K.B., and the fact that he is her only available caregiver, constitute an extraordinary and compelling reason that warrants a reduction in his sentence.  ECF 70 at 1.

U.S.S.G. § 1B1.13(b) is titled "FAMILY CIRCUMSTANCES OF THE DEFENDANT." Section 1B1.13(b)(3)(C) provides for an extraordinary and compelling reason based on "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent."  Therefore, under this section, a court examines: (1) The parent's incapacitation; and (2) whether the defendant is the only available caregiver. *United States v. Villar*, LAH-16-340, 2024 WL 2939018, at *3 (N.D. Ill. June 11, 2024).

### 1. Incapacitation

Notably, "incapacitation" is a high bar. The BOP has previously defined incapacitation narrowly, *i.e.*, when the family member (1) has "[s]uffered a serious injury, or a debilitating physical illness" such that the family member "is completely disabled, meaning that the [family member] cannot carry on any self-care and is totally confined to a bed or chair," or (2) has "[a] severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the [family member's] mental capacity or function), but may not be confined to a bed or chair." Fed. Bureau of Prisons, Program Statement 5050.50 at 10 (2019) https://www.bop.gov/policy/progstat/5050_050_EN.pdf (alterations added).  Moreover, "[c]ourts have interpreted incapacitation in this context to mean that the individual is 'completely disabled' and 'cannot carry on any self-care' or 'is totally confined to a bed or chair.'" *United States v. Howard*, NJR-21-30187-1, 2025 WL 1684262, at *2 (S.D. Ill. June 16, 2025) (collecting cases); *see United States v. Gross*, HAB-17-37, 2024 WL 4100325, at *3 (N.D. Ind. Sept. 5, 2024); *United States v. Steele*, DRC-20-13-14, 2024 WL 1928945, at *3 (S.D. Ohio May 1, 2024).

Therefore, an individual does not qualify as incapacitated when the medical conditions impact daily life but do not severely impede functionality. *See United States v. Swarn*, JRT-20-118, 2025 WL 2306990, at *2 (D. Minn. Aug. 11, 2025) (finding no incapacitation because medical records "contain no indication that [defendant's] mother is bedridden, chair-bound, or suffering from cognitive decline." ); *United States v. Stayton*, LCB-19-255-1, 2025 WL 1359805, at *3 (M.D.N.C. May 9, 2025) (finding that "the mere existence of a parent being elderly and who has general health issues does not demonstrate incapacitation."); *United States v. Dewalt*, CCE-20-78, 2025 WL 3213875, at *3 (M.D.N.C. Nov. 18, 2025) ("The case law is consistent that evidence of an elderly parent with health issues is not sufficient to show incapacitation."); *United*

*States v. Vaughn*, MFU-10-17, 2025 WL 84215, at *6 (W.D. Va. Jan. 13, 2025) ("The court is sympathetic to Vaughn's desire to care for his mother, but the evidence submitted does not show that her medical conditions are so dire that she has become incapacitated."); *United States v. Bass*, RLW-19-35, 2024 WL 3552030, at *3 (E.D. Mo. July 26, 2024) (finding defendant failed to present evidence that his father was incapacitated); *United States v. Armstrong*, TDC-16-0601, 2024 WL 1096621, at *2 (D. Md. Mar. 13, 2024) (no showing of incapacitation based only on the allegation that a parent suffered from heart disease and required regular assistance). Furthermore, "general claims" from a defendant's mother "that it would be helpful for her son to take care of her and cook and clean for her do not suffice to demonstrate incapacity." *Gross*, 2024 WL 4100325, at *3; *see United States v. Wendel*, JJH-19-219, 2024 WL 2748493, at *2 (N.D. Ohio May 29, 2024) ("Ms. Wendel's general assertion she is unable to 'manage her home' is not sufficient to demonstrate that she is incapacitated.").

The case of *United States v. Stamper*, FDW-20-00295, 2024 WL 3512807 (W.D.N.C. July 23, 2024), is instructive. There, the court wrote, *id.* at *5 (alterations added): "Defendant states his mother lives alone and has hearing loss, vision loss, st[e]nts in her heart, and is suffering from the beginning stages of Alzheimer's. She also has [a] history of falls." A letter from the defendant's mother corroborated her health issues and requested the defendant's assistance. However, the court ruled that the defendant had not established his mother's incapacity, stating *id.*: "While the Court does not deny his mother's health concerns as legitimate, and empathizes with her difficulties, Defendant does not provide additional verifiable medical documentation establishing his mother is incapacitated and in need of a full-time caregiver." Furthermore, the court noted that although the "mother's conditions may worsen and eventually need full-time care, she currently is not incapable of caring for herself." *Id.*

25

In the Motion, defendant declares: "By any common-sense application of the term, [K.B.] is incapacitated." ECF 81 at 7. She "survived Guillain-Barre syndrome and re-learned how to work and function, but suffers from serious cardiac conditions and high cholesterol, issues related to high blood pressure and blood sugar and potassium, hypothyroidism, and various forms of debilitating pain." *Id.*

In support of the Motion, defendant has submitted K.B.'s medical records with respect to six doctor visits. ECF 81-2 at 3–29. Burney notes that the records "indicate that [K.B.'s] daily regimen includes 10 different medications and vitamins, including the powerful painkiller oxycodone-acetaminophen (Percocet)." ECF 81 at 7–8. The medical records are accompanied by a cover letter from defendant's mother, in which she explains that she underwent an MRI on October 10, 2024. ECF 81-2 at 2. The MRI was "ordered by [her] pain management Dr., Dr. Lorenzo," whom she sees "once a month." *Id.* Further, she explains: "I retired in Mar. 1995 as a mail carrier due to the back and chronic fatigue from Guillian Barre." *Id.*

As of April 4, 2025, the date of the most recent medical records for K.B., her "problem list" included: "Gastroesophageal reflux disease without esophagitis"; "Essential hypertension"; "Fatigue"; "Hypothyroidism due to Hashimoto's thyroiditis"; "Hypokalemia"; "Impaired fasting glucose"; "Family history of premature [coronary artery disease]"; and "Coronary artery calcification seen on CT scan". *Id.* at 27–28. Further, the records indicate that as of April 4, 2025, the following medications were prescribed for K.B.: "cholecalciferol"; "cyanocobalamin"; "ezetimibe"; "hydrochlorothiazide"; "levothyroxine"; "magnesium oxide"; "oxycodone-acetaminophen"; "pantoprazole"; "potassium chloride"; and "pravastatin". *Id.* at 29.

In the letter from R.H. (ECF 81-3), she explains that her mother's "health has recently deteriorated significantly and her medical needs are chronic, severe, and require supervision and

care." *Id.* at 2. Further, she asserts that K.B. "needs care on a daily basis. She needs someone to help with getting groceries, managing medications, assisting her to all appointments, prepare meals, and help take care of herself and maintain her home." *Id.* According to R.H., her mother is "most always in her bed/sleeping. She's obviously depressed, she has cognitive issues, moderate to severe sleep apnea, severe debilitating back pain and doesn't even want to get out of bed." *Id.*

R.H. recounts that K.B. had "Gillian Barre" [sic] in 1991, and was "suddenly paralyzed and had to learn to walk again . . . ." *Id.* at 2. Moreover, she was hospitalized during the pandemic with COVID 19 and pancreatitis. *Id.* R.H. states: "[K.B.] has never fully recovered physically and mentally after that hospital stay." *Id.* She adds that K.B. is "mentally overwhelmed . . . ." *Id.*

In addition, R.H. states that her mother is "in severe pain all the time and not doing well. Day to day life is extremely difficult for her." *Id.* at 3. And, R.H. asserts that defendant "is the only person in the family who can take care of our mother. [K.B.'s] husband, Donald, passed away over 42 years ago. I am retired on disability . . . ." *Id.* She then recounts her own medical issues. *Id.* And, she claims that S.B. is also unavailable "due to her own health issues . . . ." *Id.*

According to the government, "the Defendant has not established that his mother . . . is incapacitated." ECF 85 at 10. The government concedes that K.B.'s medical conditions are "very serious", but maintains that defendant has failed to "provide[] the Court with a sufficient factual basis to find that his mother is '*completely* disabled,' that she 'cannot carry on *any* self-care,' and that she is '*totally* confined to a bed or chair.'" *Id.* at 11 (quoting BOP Program Statement § 5050.50 at 10) (emphasis added by government). And, the government contends that it "has not been able to identify within the Defendant's mother's medical records any objective criteria demonstrating that she is 'completely disabled,' incapable of 'any self-care' and 'totally confined to a bed.'" *Id.* (citing ECF 81-2).

I agree with the government.  K.B.'s medical records do not support defendant's assertions of incapacitation, which, as noted, "[c]ourts have interpreted . . . to mean that the individual is 'completely disabled' and 'cannot carry on any self-care' or 'is totally confined to a bed or chair.'" *United States v. Howard*, No. 3:21-CR-30187-NJR-1, 2025 WL 1684262, at *2 (S.D. Ill. June 16, 2025) (collecting cases).

To be sure, K.B.'s health conditions are significant.  And, R.H. represents that K.B. is "most always in her bed/sleeping."  ECF 81-3 at 2.  But, the existence of a medical condition and older age alone do not establish incapacitation.  Indeed, "[t]he case law is consistent that evidence of an elderly parent with health issues is not sufficient to show incapacitation." *United States v. Dewalt*, CCE-20-78, 2025 WL 3213875, at *3 (M.D.N.C. Nov. 18, 2025) (finding no incapacitation despite evidence that father "has some serious health issues and could use assistance"); *see United States v. Armstrong*, TDC-16-0601, 2024 WL 1096621, at *2 (D. Md. Mar. 13, 2024) (finding no incapacitation when only allegation was that mother had heart disease and needed regular care); *United States v. Bartlett*, HAB-14-14, 2025 WL 1272136, at *3 (N.D. Ind. May 1, 2025) (finding no incapacitation despite documented medical conditions because "nothing in [defendant's] motion suggests, much less demonstrates, that [his mother] cannot . . . provide self-care.") (alterations added).

Moreover, with respect to K.B.'s prior diagnosis of Guillain-Barre syndrome, defendant represents that "[s]he survived . . . and re-learned how to work and function."  ECF 81 at 7.  This suggests that the syndrome is no longer an acute medical issue.

Defendant's desire to care for his mother is admirable.  But, I must construe the words of the Guidelines in accordance with their ordinary meaning. *See United States v. Boler*, 115 F.4th 316, 323 (4th Cir. 2024); *United States v. Haas*, 986 F.3d 467, 480 (4th Cir. 2021).  Defendant has

not established that K.B. is incapacitated. It follows that he has failed to establish an extraordinary and compelling reason for his release on this basis.

## 2. Only Available Caregiver

Assuming, *arguendo*, that K.B.'s medical status rises to the level of incapacitation, defendant must also establish that he is his mother's sole available caregiver.

Burney claims that his sisters, S.B. and R.H., "have serious medical conditions that prevent them from properly caring for their mother and effectively make Mr. Burney the only available caregiver for the parent." ECF 81 at 8.

If a defendant relies on a sole-caregiver argument, "courts generally require a showing of evidence from several sources indicating that the defendant is the only available caregiver for a family member in dire conditions, before concluding that an extraordinary and compelling reason has been established." *United States v. Polanco-Gonzalez*, VM-17-0688, 2026 WL 177831, at *3 (S.D.N.Y. Jan. 21, 2026); *see United States v. Young*, MMG-24-00273, 2025 WL 3496277, at *3 (S.D.N.Y. Dec. 5, 2025); *United States v. Ruiz-Patozano*, JGK-20-686, 2025 WL 3136595, at *2 (S.D.N.Y. Nov. 10, 2025); *United States v. Doe*, JAW-17-00091-1, 2024 WL 4751731, at *12 (D. Me. Nov. 12, 2024); *Gross*, 2024 WL 4100325, at *3; *see also United States v. Figueroa-Gibson*, RAM-16-802, 2024 WL 376432, at *6 (D.P.R. Jan. 31, 2024) (finding that although defendant claimed geographic distance and mental infirmity of family members, without "more evidence as to these challenges, the Court cannot find that these other family members are unable to provide adequate care."); *United States v. Striganivicz*, Y-95-271, 2023 WL 4868100, at *1 (E.D. Pa. July 31, 2023) (explaining that courts have "denied motions for compassionate release premised on sick or elderly parents in the absence of strong evidence the petitioner is the *sole* individual capable of caring for the parent.") (cleaned up) (emphasis in original).

29

As indicated, defendant submitted a letter from his mother. *See* ECF 81-2 at 2. In the letter, K.B. states: "Jesse will be a great help to me as my pain increases. He is the only son who is healthy. Jesse also has a daughter who's mother passed Nov. 19 2018 at the age of 44. I took care of his daughter after that time. She is 23 now with a 4 yr. daughter. I know having Jesse home will help her greatly. She misses her dad." ECF 81-2 at 2.

Burney also provides letters from his two sisters, R.H. (ECF 81-3) and S.B. (ECF 81-5), as well as their medical records. *See* ECF 81-4 (Medical Records of R.H.); ECF 81-6 (Medical Records of S.B.). Both sisters claim that they cannot care for their mother due to their own health problems.

R.H., who is 51 years old (ECF 81-4 at 2), states that she suffers from "generalized anxiety disorder with panic attacks and poor short term memory, concentrating, focusing, and other cognitive issues." ECF 81-3 at 3. Moreover, she represents, *id.*:

> I also have chronic fatigue and I am in severe pain throughout the days as I have fibromyalgia, arthritis, sleep apnea, severe shoulder pain, severe neck pain due to cervical stenosis, severe lumbar pain, severe hip pain, severe leg pain, chronic inflammation throughout my body, and nerve pain which also causes tingling in my arms, hands, fingers, and sides of my lumbar spine. My significant other must help me with simple daily tasks, getting groceries, and my medications, during hours he's not working. He is also my sole ride, as we don't live close to any family. He has to get me to all my appointments as I am unable to drive anymore.

R.H. also writes that the family is "not financially able to hire a professional or have our mother go to assisted living. She also refuses and is not ready to leave her home." *Id.* She avers: "My brother, Jesse, is the only person in the family who can take care of our mother. *id.*

S.B., who is 45 years old (ECF 81-6 at 2), describes her health conditions as "a daily struggle" that "make things difficult at times." ECF 81-5 at 3. In her letter to the Court, she states, *id.* at 2-3 (boldface omitted):

I [S.B.] have a history of ER-positive left breast cancer (treated, on aromatase inhibitor, high risk for recurrence) and postsurgical menopause. Major comorbidities include obesity, type 2 diabetes (controlled, non-insulin), hypertension, mixed hyperlipidemia, and aortic root dilatation, all contributing to cardiovascular risk. Additional conditions include Idiopathic Intracranial Hypertension, migraines, right-sided tinnitus, obstructive sleep apnea, asthma, reflux, and anemia. Mental health history is significant for major depressive disorder and generalized anxiety disorder.

S.B. concludes: "I believe with the declining health of myself and my mother Jesse would become an integral part of ensuring things are taken care of with us." *Id.* at 3. But, of import, S.B. resides in the same household as her mother. ECF 70 at 6. Although her letter describes her challenging medical history, she characterizes her conditions as ones that "make things difficult *at times*." ECF 81-5 at 3 (emphasis added). She does not claim that she is never able to assist her mother with her daily needs. And, her belief that defendant "would become an integral part of ensuring things are taken care of" (*id*.) falls short of representing that she herself cannot provide assistance.

Moreover, as the government points out in the Opposition (ECF 85 at 12), S.B.'s medical records indicate that she suffers from allergies and "[m]ild intermittent asthma." ECF 81-6 at 7. But, the records do not appear to support the conclusion that S.B.'s medical conditions make it impossible for her to care for her mother. ECF 81-6 at 7.

R.H. does not live with K.B. She relies on her partner for assistance with daily tasks. These circumstances bear on whether she is well-positioned to serve as K.B.'s primary caregiver. Further, R.H. represents that the family cannot afford professional or assisted-living for their mother. ECF 81-3 at 3.

Notably, the inquiry under U.S.S.G. § 1B1.13(b)(3)(C) is not whether the defendant is the optimal caregiver. Rather, it is whether defendant is the *only available* one.

31

In my view, defendant has not made the "robust evidentiary showing that [he] is the only available caregiver," as the law requires. *United States v. Richardson*, IFL-18-507, 2020 WL 2200853, at *2 (E.D.N.C. May 6, 2020). The Court does not doubt the sincerity of defendant's desire to care for his mother, nor the seriousness of the medical conditions of K.B., R.H., and S.B. But, the Guidelines require that defendant be the parent's only available caregiver, U.S.S.G. § 1B1.13(b)(3)(C). On this record, I conclude that defendant has not carried that burden.

### C. 18 U.S.C. § 3553(a)

Even assuming, *arguendo*, that defendant established an extraordinary and compelling reason for compassionate release, that finding would not end the inquiry. The Court must next consider the sentencing factors in 18 U.S.C. § 3553(a). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

In my view, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time.

R.H. represents in her letter to the Court that defendant "has participated in jobs, programs, churches, and even became a positive teacher in church and programs." ECF 81-3 at 3. But, Burney provides minimal information with respect to his rehabilitation efforts. For example, Burney does not indicate in the Motion whether he has completed any education courses while in BOP custody.

To be sure, Burney acknowledges the severity of his offenses. In the Motion, Burney writes: "I know that I am not innocent and that my crimes were serious. I know that I've needlessly frightened and horrified innocent people, and in no way am I diminishing the role I've played in all this. It is through my foolishness that my family suffers to this day." ECF 70 at 7–8. Further, he asserts, ECF 81 at 8, 9 (emphasis in original):

> If released, Mr. Burney plans to live with his mother in his native Harrisburg and to devote all of his time to finding employment and assisting her, his 22-year-old daughter, and his four-year-old granddaughter. He is 43 years old, an age by which some offenders have outgrown youthful impulsiveness and foolishness and have spent enough time in prison to want to make something of the rest of their lives. Mr. Burney will be strongly motivated not to place himself in any further situations that might cause his return to prison *and* imperil his mother.[]

The government argues that the sentencing factors "do not support a reduction in the Defendant's sentence, especially to time-served, as requested in the Defendant's Supplemental Memorandum." ECF 85 at 13. According to the government, "the nature and circumstances of the offense, the history and characteristics of the Defendant, and the need for specific deterrence and to protect the public, weigh heavily in favor of not reducing the Defendant's sentence at this time." *Id.* In particular, the government emphasizes that "this was Defendant's thirteenth bank robbery", and he committed the underlying offense while he was on supervised release "for the bank robbery spree that resulted in his criminal conviction in Pennsylvania." *Id.* The government posits, *id.*: "Just as the Defendant was not deterred by his prior federal sentence, he also appears not to have been deterred by this Court's 252-month sentence."

Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019); *Kibble*, 992 F.3d at 334 n.3. Courts place significant weight on a defendant's post-

sentencing conduct because it "provides the most up-to-date picture" of a defendant's "'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the[ ] initial sentencing[ ]." *McDonald*, 986 F.3d at 412; *see Martin*, 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts).

In other words, a defendant's rehabilitation efforts should be considered in regard to a motion for compassionate release. *See United States v. Lancaster*, 997 F.3d 171, 175 (2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the district court must consider defendant's post-sentencing conduct); *Martin,* 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). However, "rehabilitation alone cannot constitute an extraordinary and compelling reason for release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022).

As the government emphasizes, Burney's crime was a very serious one. ECF 85 at 13. At Burney's sentencing, I described the crime as "a particularly egregious one" (ECF 85-1 at 72), and "extremely horrific" (*id.* at 73). Indeed, Burney robbed a bank wearing a tactical vest and motorcycle helmet, with a visible AK-47 poking out of his backpack, and holding a taser. ECF 43 at 9. And, throughout the course of the robbery, he threatened to shoot Bank employees if they

did not cooperate. *Id*. He then fled the scene with $100,000. *Id*. Fortunately, no one was injured, but such conduct was in complete disregard for the safety of others. In my view, the seriousness of the instant offense weighs against reducing Burney's sentence.

Additionally, the Court cannot overlook defendant's serious criminal history. As discussed, this was defendant's thirteenth bank robbery. ECF 61 at 12. Of import, he committed the instant offense while on supervised release for twelve prior bank robberies that resulted in a federal conviction in Pennsylvania, for which he received a twelve-year sentence of imprisonment. *Id*. Yet, that lengthy sentence did not deter defendant from the commission of the serious crime at issue here.

Furthermore, I cannot ignore defendant's disciplinary record while in the BOP. *See* 18 U.S.C. § 3582(c)(1)(A)(ii) (A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community). As noted, as of October 15, 2025, Burney's disciplinary records at the BOP reflect thirteen incidents, resulting in fifteen sanctions against him, which reflect poorly on his adjustment. ECF 85-3.

For example, in December of 2022, Burney was sanctioned for assaulting without serious injury. *Id.* at 2. And, in November of 2022, Burney was disciplined for possessing a dangerous weapon. *Id.* In January of 2022, Burney was punished for fighting with another person. *Id.* at 3. He has also been disciplined for refusing to obey an order on multiple occasions. *Id.* at 3, 4. These infractions counsel against a finding that Burney has been rehabilitated.

I recognize, on a positive note, that as of October 15, 2025, Burney had not incurred any infractions since December 11, 2022. *Id.* at 2. The Court has considered that Burney has not incurred disciplinary infractions in approximately three years, which is meaningful evidence of rehabilitation. But, weighed against the gravity of the instant offense, which was committed while Burney was on supervised release, the defendant's prior history of similar conduct, and the failure of a substantial prior sentence to deter him from further crime, as well as the need to promote respect for the law, I conclude that a reduction in sentence is not warranted at this time.

For the foregoing reasons, I am persuaded that the § 3553(a) factors weigh against Burney.

### IV. Conclusion

Given the seriousness of Burney's offense, a reduction in the sentence would not, in my view, promote respect for the law, provide just punishment, or deter criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(A)–(C). Therefore, I shall deny defendant's Motion, without prejudice to his right to renew his Motion at a later time.[5]

An Order follows, consistent with this Memorandum Opinion.

Date: June 1, 2026                          /s/
                                    Ellen Lipton Hollander
                                    United States District Judge

---

[5] The Court recognizes that the Motion has been pending for almost a year. If the medical conditions of defendant's mother and/or sisters have worsened in the interim, defendant certainly may ask the Court to reconsider its ruling. If he does so, he should provide the Court with updated medical records.